UNITED STATES DISTRICT COURT FOR THE
NORTHERN DISTRICT OF FLORIDA
PANAMA CITY DIVISION

CHARLES PATRICK KILLACKY,
     Petitioner,

vs.                          Case No.:  5:24cv206/MW/ZCB

WARDEN ROBERT FLORES,
     Respondent.
_____/

## **REPORT AND RECOMMENDATION**

Petitioner, Charles Killacky, has filed a habeas corpus petition under 28 U.S.C. § 2254.  (Doc. 1).  Respondent has moved to dismiss the petition as untimely and procedurally barred.  (Doc. 12).  Petitioner argues that equitable tolling and actual innocence provide gateways for a merits review of his habeas claims.  (Doc. 16).  For the reasons below, Respondent's motion to dismiss should be granted.[1]

---

[1] This matter can be resolved without an evidentiary hearing.  Rule 8(a), Rules Governing Section 2254 Cases.

# I.    Background

The victim in this case was severely injured after she left a bar with Petitioner and one of his co-workers.  These are the events leading up to her injuries.[2]

Petitioner, Robert Reveles (the victim's boyfriend), and Elton Spence worked together at a restaurant.  On January 8, 2018, they gathered at Petitioner's house to repair a sink and then watch the National Championship game.  Reveles brought his girlfriend, the victim, with him.  Petitioner and the victim started drinking at the house.  The group then moved to a nearby bar to watch the game.  They drove in two separate cars.

When they arrived at the bar, Reveles and Petitioner went to a crowded, "chaotic" area.  The victim and Spence went to a less crowded area.  Petitioner twice came over and spoke with the victim and Spence.  The first time, the victim and Spence asked where Reveles was, and Petitioner responded that Reveles was "having a good time with a beer in his hand."  The victim thought this strange, because Reveles didn't

---

[2] This description is based on portions of the trial transcript included in the state court record.  (Doc. 12-7 at 38-170).

drink alcohol. The second time Petitioner came over, he said Reveles had left the bar and went to Petitioner's house with food so they all could finish watching the game there. Again, the victim thought this strange, because the reason they went to the bar was because Petitioner couldn't get the game on his television. When the victim asked Petitioner about that, Petitioner said he had called the cable company, and the television was fixed. Petitioner told the victim and Spence that Reveles was waiting for them at the house.

Petitioner, the victim, and Spence left the bar in Spence's car. When they arrived at Petitioner's house, Reveles's car was in the driveway. The victim got out of the car and asked Spence if he was coming inside. Petitioner said Spence was not coming in because he had to work in the morning. The victim went to Petitioner's front door. Petitioner came up behind her and opened it. When the victim stepped inside the house, she called Reveles's name.

Petitioner suddenly smashed the victim's head against the wall. The victim fell to her knees. She got up, and Petitioner grabbed her and choked her. The victim regained consciousness and crawled out of the house. Petitioner pulled her back in the house by her ponytail. He

punched her in the face and again choked her to unconsciousness. She regained consciousness and realized her shirt was off. She passed out again, and when she came to, she was lying in Petitioner's front yard on her back. Her shirt was off, and Petitioner was trying to unzip her pants. Petitioner was hitting her. The victim crawled across the street and onto a neighbor's porch. Petitioner followed her, dragged her off the porch by her ponytail, and then choked and hit her. The victim screamed and begged Petitioner to stop hitting her. She eventually lost consciousness.

Petitioner described a very different version of events when Spence left him and the victim at Petitioner's house. Petitioner testified he told the victim and Spence that Reveles wasn't there, so he was surprised when she asked where he was. According to Petitioner, the victim stayed near Reveles's car and never approached the front door to the house. Petitioner described that he shushed the victim because she was getting loud. According to him, the victim became agitated and hysterical. She went into the road, and Petitioner went into the house. Petitioner heard the victim repeatedly screaming Reveles's name. He became concerned that neighbor would call police, so he approached the victim. He tried to touch her shoulder, and she "whirled" around. Petitioner stumbled

4

backwards and fell.  When he tried to get up, the victim kicked him in the thighs.  Petitioner "flailed in the dirt" and tried to back away, but the victim kicked him again in the thighs and buttocks.  The victim fell, and Petitioner heard her hit the ground with a loud thud.  Petitioner rolled on his stomach, stood up, and began crossing the road to his house.  He saw the victim on the ground but "ceased to be concerned for her."  He admitted he was 6'5" tall and weighed 280 pounds, and the victim was considerably shorter and smaller.[3]

Deputies responded to a report of a woman screaming.  When they arrived at the scene, Petitioner was walking across the street from where the victim was lying on the ground to his house.  He appeared "frazzled."  His hair was unkempt, and his clothes were disheveled and dirty.  Deputies asked Petitioner what was going on.  Petitioner said he brought a female to his house, and she "went crazy."  Petitioner said the female ran out of the house and he chased her.  Deputies asked where the female was.  Petitioner pointed to the area he had just come from and said, "She's over there.  She passed out."    A deputy walked to the area where

---

[3] During closing arguments, defense counsel described the victim as a "little bitty woman."  (Doc. 12-7 at 166).

Petitioner pointed. He came upon a white female with her shirt off. Her face was beaten and bloody. The deputy initially thought she was dead. Deputies described the victim as "out of it" and unaware of her surroundings. They believed she may be intoxicated or under the influence of something. Deputies detained Petitioner and called an ambulance for the victim.

The victim regained consciousness in the ambulance but believed she was inside a van parked in Petitioner's driveway. She became upset and combative and tried to leave. According to a first responder, the victim had extensive head injuries and may have been concussed. After observing abrasions and what appeared to be "road rash" on the victim's body, the responder asked her if she had been thrown from a vehicle. The victim initially responded yes but later said no. She also reported that Petitioner hit her with a pot or pan inside the house but at trial said she did not see what he hit her with.

Deputies did not find a pot or pan in Petitioner's house. They also did not find evidence of a violent struggle inside the house. But they found disturbed areas of the front yard and overturned pots. Deputies investigated the possibility that the victim may have been thrown from

6

a car but then determined the timeline of events precluded that possibility.

At the Sheriff's Office, a deputy photographed Petitioner. Petitioner had "fresh claw marks" on his chest, and his shirt was dirty. Petitioner had scratches on his right forearm, bruising on his wrist, and bruising and abrasions around his knuckles. A deputy swabbed an area of dried blood on Petitioner's knuckle and hand and sent it to a lab for forensic testing. Testing showed a mixture of DNA from two donors. The DNA profile was greater than seven hundred billion times more likely to occur if the blood originated from Petitioner and the victim than from Petitioner and any other individual.

Petitioner was charged in the Bay County Circuit Court with attempted sexual battery, aggravated battery with severe physical injury, and false imprisonment. (Doc. 12-7 at 21).[4] A jury convicted Petitioner as charged. (*Id.* at 23). The trial court sentenced Petitioner to a total term of thirty years' imprisonment. (Doc. 12-1). Petitioner appealed, and the First District Court of Appeal ("First DCA") affirmed

---

[4] Petitioner was also charged with aggravated assault, but the prosecutor did not pursue that count.

on August 10, 2021. (Doc. 12-2; Doc. 12-4). Petitioner did not seek further direct appellate review.

On April 12, 2022, Petitioner filed a motion for postconviction relief in the trial court under Florida Rule of Criminal Procedure 3.850. (Doc. 12-5, 12-6, 12-8). The trial court denied relief on May 30, 2023. (Doc. 12-7). Petitioner did not appeal.

Petitioner filed the current 28 U.S.C. § 2254 habeas corpus action on September 9, 2024. (Doc. 1). Respondent has moved to dismiss the petition, arguing that it was filed after expiration of the one-year limitations period found in 28 U.S.C. § 2244(d)(1). (Doc. 12). Respondent also argues Petitioner's claims are unexhausted and procedurally barred. (*Id.*). Petitioner concedes his habeas petition is untimely. (Doc. 2 at 2). He argues, however, that he is entitled to equitable tolling because he has been diligently pursuing relief from his conviction. (Doc. 1 at 14; Doc. 2 at 3). He also argues he is actually innocent and entitled to proceed under the "fundamental miscarriage of justice" exception to the time bar. (Doc. 1 at 14; Doc. 2 at 4-6).

## II.    Discussion

## A.    Petitioner's § 2254 petition was untimely filed.

A one-year limitations period applies to the filing of a § 2254 habeas

petition. 28 U.S.C. § 2244(d)(1). The one-year period runs from the latest

of:

> (A) the date on which the judgment became final by the
> conclusion of direct review or the expiration of the time for
> seeking such review;
> (B) the date on which the impediment to filing an
> application created by State action in violation of the
> Constitution or laws of the United States is removed, if the
> applicant was prevented from filing by such State action;
> (C) the date on which the constitutional right asserted
> was initially recognized by the Supreme Court, if the right has
> been newly recognized by the Supreme Court and made
> retroactively applicable to cases on collateral review; or
> (D) the date on which the factual predicate of the claim
> or claims presented could have been discovered through the
> exercise of due diligence.

28 U.S.C. § 2244(d)(1). The statute also includes a tolling provision that

provides as follows: "The time during which a properly filed application

for State post-conviction or other collateral review with respect to the

pertinent judgment or claim is pending shall not be counted toward any

period of limitation . . . ." 28 U.S.C. § 2244(d)(2).

It is undisputed that the trigger for the one-year period in this case is the date the judgment became final under § 2244(d)(1)(A). (Doc. 2 at 2; Doc. 12 at 8). Petitioner's judgment became final when the ninety-day window to seek review in the Supreme Court of the United States closed. *Chavers v. Sec'y, Fla. Dep't of Corr.*, 468 F.3d 1273, 1275 (11th Cir. 2006). That ninety-day period began on August 10, 2021—the date the First DCA affirmed Petitioner's conviction and sentence. (Doc. 12-4). Petitioner's conviction became final ninety days later, on November 8, 2021. *See Chavers*, 468 F.3d at 1275. (finding that the one-year period began to run ninety days from the date the state appellate court issued its judgment and not from the date the mandate issued). The clock for the federal limitations period started running the next day, November 9, 2021. *See* Fed. R. Civ. P. 6(a) (stating that when computing a time period for the occurrence of an event specified by the law, the Court should "exclude the day of the event that triggers the period").

The clock ran for 154 days before pausing on April 12, 2022, when Petitioner filed a tolling motion (i.e., his Rule 3.850 motion). (Doc. 12-5); 28 U.S.C. § 2244(d)(2) (tolling the time during the pendency of a properly filed state court motion for postconviction relief or other collateral

review).  The federal clock began running again on June 30, 2023, the day after Petitioner's time to appeal the denial of his Rule 3.850 motion expired.[5]  *See* Fla R. App. P. 9.140(e); *Westmoreland v. Warden*, 817 F.3d 751, 753 (11th Cir. 2016) (explaining that a state postconviction motion tolls the federal limitations period until it is fully resolved, which includes the time for filing an appeal even if no appeal is filed).[6]

The federal clock then ran for 211 days until the one-year time period expired on January 27, 2024 (154 days + 211 days = 365 days). Petitioner did not file his § 2254 petition until September 9, 2024.  (Doc. 1).  Because September 9, 2024, came after January 27, 2024, the petition was untimely filed.

**B.    Petitioner is not entitled to equitable tolling.**

Having concluded that the habeas petition was untimely even after factoring in statutory tolling under 28 U.S.C. § 2244(d)(2), the Court will address whether equitable tolling applies.  "[A] petitioner is entitled to

---

[5] As previously noted, the trial court denied Petitioner's Rule 3.850 motion on May 30, 2023.  (Doc. 12-7).

[6] *See also Dukes v. Sec'y, Fla. Dep't of Corr.*, No. 21-13203-C, 2022 WL 832280, at *3 (11th Cir. Feb. 9, 2022) (explaining that the federal limitations period resumed when the thirty-day deadline to appeal the state court's denial of petitioner's postconviction motion expired).

equitable tolling only if he shows (1) that he has been pursuing his rights diligently, and (2) that some extraordinary circumstance stood in his way and prevented timely filing." *Holland v. Florida*, 560 U.S. 631, 649 (2010) (cleaned up). "The diligence required for equitable tolling purposes is reasonable diligence, not maximum feasible diligence." *Cole v. Warden, Ga. State Prison*, 768 F.3d 1150, 1158 (11th Cir. 2014) (cleaned up). There is also a causation requirement, which means that for equitable tolling to apply there must be a causal connection between the extraordinary circumstance and the failure to timely file. *Thomas v. Att'y Gen.*, 795 F.3d 1286, 1292 (11th Cir. 2015) (holding that absent a causal connection, tolling is not available).

As an extraordinary remedy, equitable tolling is "limited to rare and exceptional circumstances and typically applied sparingly." *Hunter v. Ferrell*, 587 F.3d 1304, 1308 (11th Cir. 2009) (cleaned up). The petitioner bears the burden of showing entitlement to equitable tolling. *Cole*, 768 F.3d at 1158. Meeting that burden requires supporting allegations that are "specific and not conclusory." *Id*. A "petitioner is not entitled to equitable tolling simply because he alleges constitutional violations at his trial or sentencing." *Id*.

12

Petitioner has not satisfied his burden of demonstrating that equitable tolling applies. He has not alleged the existence of any extraordinary circumstance. And although he alleges that he exercised reasonable diligence in pursuing his rights (Doc. 1 at 14; Doc. 2 at 3; Doc. 16 at 2-4), the record does not bear that out. Instead, the record shows that Petitioner sat on his rights for several months after his state proceedings concluded and before his federal filing deadline expired. He then waited several more months before he filed his federal petition. For those reasons, Petitioner is not entitled to equitable tolling of the federal limitations period.

### C. Petitioner is not entitled to proceed under the "fundamental miscarriage of justice" or "actual innocence" exception.

The Court will next address Petitioner's argument that the "fundamental miscarriage of justice" exception applies. Petitioner asserts that the Court's failure to consider his habeas claims on the merits "is abrahsive [sic] to his actually innocence." (Doc. 1 at 14; Doc. 2 at 4-6; Doc. 16 at 5-8). He alleges "inconsistencies and deficiencies" in the evidence presented at trial rendered the evidence insufficient to support his conviction. (Doc. 16 at 5-6). Petitioner also alleges testimony

13

of two un-called witnesses, Robert Reveles and Elton Spence, would have undermined the victim's testimony and corroborated his version of events. (Doc. 2 at 8; Doc. 16 at 6-8). He alleges it is more likely than not that no reasonable juror would have convicted him if the jury had heard the testimony of Mr. Reveles and Mr. Spence. (Doc. 2 at 6, 9; Doc. 16 at 7).

The Supreme Court has held that actual innocence serves as a gateway through which a petitioner may obtain review of an untimely habeas petition. *McQuiggin v. Perkins*, 569 U.S. 383, 386 (2013). In this context, "'actual innocence' means factual innocence, not mere legal insufficiency." *Bousley v. United States*, 523 U.S. 614, 623-24 (1998). To pass through the actual innocence gateway, a petitioner must satisfy the standard articulated in *Schlup v. Delo*, 513 U.S. 298 (1995). *See McQuiggin*, 569 U.S. at 386 (applying the *Schlup* standard to untimely § 2254 petitions). The *Schlup* standard requires a petitioner to show "that, in light of new evidence, it is more likely than not that no reasonable juror would have found petitioner guilty beyond a reasonable a doubt." *House v. Bell*, 547 U.S. 518, 536-37 (2006) (internal quotations omitted). The *Schlup* standard is a "demanding" one that is only met "in

14

the extraordinary case." *Id.* at 536.  Thus, it is "rare" for a petitioner to obtain review of an untimely habeas petition through the actual innocence gateway. *McQuiggin*, 569 U.S. at 386.

A petitioner may demonstrate factual innocence by presenting evidence that directly absolves him of involvement in the crime.  *See Sawyer v. Whitley*, 505 U.S. 333, 340 (1992) (explaining that the petitioner could meet the actual innocence standard "where the [s]tate has convicted the wrong person of the crime."); *Stimpson v. Warden*, No. 22-10190, 2025 WL 484049, at *4 (11th Cir. Feb. 13, 2025) (explaining that one way of demonstrating actual innocence is by presenting evidence that directly absolves the petitioner of involvement in the crime). Another way of demonstrating actual innocence is by submitting evidence that "lessen[s] the probative force of the state's case to the point where a reasonable jury could not have convicted the petitioner." *Stimpson*, 2025 WL 484049, at *4 (cleaned up).  This requires a petitioner to do "more than counterbalance the evidence that sustained the petitioner's conviction." *Rozelle v. Sec'y, Fla. Dep't of Corr.*, 672 F.3d 1000, 1016-17 (11th Cir. 2012).

The Court has reviewed Petitioner's "new evidence," *i.e.*, the deposition testimony of un-called witnesses Mr. Spence and Mr. Reveles. (Doc. 12-8 at 63-84, 109-42). Considering that testimony in the context of the evidence presented at trial, a reasonable juror would still have convicted Petitioner even if these two men had testified. Here are the reasons why.

Petitioner's defense theory was that the victim was drunk by the time she left the bar and then became aggressive and injured herself after she and Petitioner were dropped off at Petitioner's house. According to the deposition testimony of Mr. Spence and Mr. Reveles, the victim was drinking that night. (Doc. 12-8 at 69, 73-74, 115). But testimony to that effect would have had little, if any, impact on the jury. That is because the jury heard about the victim's drinking from other witnesses. First responders testified that the victim was "out of it" and appeared intoxicated when they arrived on the scene. And the victim herself admitted she had been drinking. Any additional testimony on this subject would have been cumulative.

Additionally, neither Mr. Spence nor Mr. Reveles could have testified that the victim became aggressive and injured herself after she

and Petitioner were dropped off at Petitioner's home. Neither of them was at Petitioner's home at that time. Mr. Spence left immediately after he dropped off Petitioner and the victim. (Doc. 12-8 at 77-78). Mr. Reveles was with a friend getting food and did not return to Petitioner's home until after police had arrived. (*Id.* at 136).

The argument could be made that Mr. Reveles's testimony would have shown that the victim displayed somewhat of a contrary attitude earlier in the night (which could have played into the defense theory that she later became aggressive). Mr. Reveles described that the victim sat separately from him at the bar and did not want to leave with him even though they were dating. (Doc. 12-8 at 119-20, 125). But the jury heard the victim's explanation for that. She explained that the football game was especially meaningful to her because her alma mater was playing, and she was "very excited" to watch the game. She explained that Reveles (her boyfriend) sat in a "chaotic" area of the bar, and she wanted to watch the game in an uncrowded area. Mr. Spence would have corroborated this. He testified in his deposition that the victim wanted to sit in a less crowded part of the bar and was "so happy" to be watching her team. (*Id.* at 71-72, 75). Additionally, both Spence and Reveles

17

described that they did not observe any animosity, arguing, or anything out of the ordinary between the victim and Petitioner at the bar.  (*Id.* at 75, 120, 140).

Petitioner has not demonstrated that the testimony of Mr. Reveles and Mr. Spence would have "lessen[ed] the probative force of the state's case to the point where a reasonable jury could not have convicted the petitioner."  *Stimpson*, 2025 WL 484049, at *4.[7]  Without this showing, the Court cannot excuse the fact that he filed his habeas petition outside the one-year limitations period for filing habeas corpus petitions.  Because the petition is untimely, Petitioner is not entitled to habeas corpus relief.

### III.  Conclusion

For the reasons above, the petition for habeas relief under 28 U.S.C. § 2254 should be dismissed as untimely.

---

[7] In assessing the possible impact of this "new evidence," the Court has considered the "inconsistencies and deficiencies" in the trial evidence highlighted by Petitioner.  (Doc. 16 at 5-6).  Defense counsel made those arguments to the jury during closing arguments.  (Doc. 12-7 at 162-69).

## IV.   Certificate of Appealability

Rule 11(a) of the Rules Governing Section 2254 Cases in the United States District Courts provides that "[t]he district court must issue or deny a certificate of appealability when it enters a final order adverse to the applicant," and if a certificate is issued "the court must state the specific issue or issues that satisfy the showing required by 28 U.S.C. § 2253(c)(2)." 28 U.S.C. § 2254 Rule 11(a).  A timely notice of appeal must still be filed, even if the court issues a certificate of appealability.  28 U.S.C. § 2254 Rule 11(b).

"Section 2253(c) permits the issuance of a COA only where a petitioner has made a 'substantial showing of the denial of a constitutional right.'" *Miller-El v. Cockrell*, 537 U.S. 322, 336  (2003) (quoting § 2253(c)(2)).  "At the COA stage, the only question is whether the applicant has shown that 'jurists of reason could disagree with the district court's resolution of his [or her] constitutional claims or that jurists could conclude the issues presented are adequate to deserve encouragement to proceed further.'" *Buck v. Davis*, 580 U.S. 100, 115 (2017) (citing *Miller-El*, 537 U.S. at 327).  Petitioner cannot make that

showing in this case.  Therefore, the undersigned recommends denying a certificate of appealability.

The second sentence of  Rule 11(a) provides:  "Before entering the final order, the court may direct the parties to submit arguments on whether a certificate should issue."  Thus, if either party wishes to submit arguments on the issue of a certificate of appealability that party may do so in an objection to this Report and Recommendation.

Accordingly, it is respectfully **RECOMMENDED** that:

1.    Respondent's motion to dismiss (Doc. 12) be **GRANTED**.

2.    The 28 U.S.C. § 2254 petition for habeas corpus (Doc. 1) be **DISMISSED with prejudice** as untimely.

3.    A certificate of appealability be **DENIED**.

At Pensacola, Florida, this 1st day of August 2025.

/s/ *Zachary C. Bolitho*
Zachary C. Bolitho
United States Magistrate Judge

## <u>Notice to the Parties</u>

Objections to these proposed findings and recommendations must be filed within fourteen days of the date of the Report and Recommendation. <u>Any different deadline that may appear on the electronic docket is for the Court's internal use only and does not control.</u> An objecting party must serve a copy of the objections on all other parties. A party who fails to object to the magistrate judge's findings or recommendations contained in a report and recommendation waives the right to challenge on appeal the district court's order based on unobjected-to factual and legal conclusions. *See* 11th Cir. Rule 3-1; 28 U.S.C. § 636.

21